## ADOPTION OF ABBY.[1]

No. 04-P-391.

Worcester. September 15, 2004. - January 28, 2005.

Present: DUFFLY, COHEN, & GREEN, JJ.

*Minor,* Care and protection, Adoption. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Adoption,* Care and protection, Dispensing with parent's consent. *Practice, Civil,* Care and protection proceeding.

In a proceeding to adjudicate a child in need of care and protection and to dispense with the need for the mother's consent to the child's adoption, some of the judge's subsidiary findings were grounded in an exaggerated interpretation of portions of the record, some were contradictory, and others had no support in the record whatsoever; when stripped of the clearly erroneous findings, what remained on the question of the mother's present unfitness to care for the child were a large number of findings based upon episodes where the mother's parenting style was called into question, which, although not clearly erroneous, did not rise to the level of establishing the mother's current unfitness to parent the child; therefore, this court vacated the decree terminating the parental rights of the mother and remanded the matter for further proceedings. [823-829]

PETITION filed in the Worcester Division of the Juvenile Court Department on November 2, 2001.

The case was heard by *Jan L. Najemy,* J.

*Margaret M. Geary* for the mother.

*Victoria S. Cole,* Assistant Attorney General, for Department of Social Services.

*R. Susan Dillard,* Committee for Public Counsel Services, for the child.

COHEN, J. The mother of a minor child, whom we call Abby, appeals from a decree of the Worcester Juvenile Court adjudicating Abby in need of care and protection and dispensing with the

---

[1] A pseudonym.

need for the mother's consent to Abby's adoption.[2] An essential element of the judge's decision was a finding that the mother had inflicted or otherwise was responsible for injuries sustained by Abby when she was an infant. We agree with the mother that this and other central findings are clearly erroneous and that the remaining findings, taken together, do not clearly and convincingly support the judge's ultimate conclusion that the mother is currently unfit to care for Abby.

We begin with the observation that nearly every paragraph of the judge's decision in this case, including the findings and the application of statutory factors set forth in G. L. c. 210, § 3(c), was taken verbatim from either the proposed findings and conclusions submitted by the Department of Social Services (department) or those submitted by the attorney for the child. As we have expressed in the past, we are sympathetic to the pressures imposed upon busy trial judges that may prompt the adoption of proposed findings. See *Care & Protection of Olga*, 57 Mass. App. Ct. 821, 823 (2003). Even though the judge did not adopt each and every finding proposed by these parties, this practice calls into question whether all of the arguments and all of the evidence were, in fact, thoroughly considered by the judge. "When adopted findings silently reject contrary evidence, it is difficult to know whether the judge actively chose to reject that evidence." *Id.* at 824 n.3. As we have also said in the past, "Troublesome facts . . . are to be faced rather than ignored. . . . Only then is the judge's conclusion entitled to the great respect traditionally given to discretionary decisions." *Adoption of Stuart*, 39 Mass. App. Ct. 380, 382 (1995), quoting from *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688-689 (1975). That said, when a judge relies on adopted findings, the standard of review does not change, but we subject the findings to "stricter scrutiny." *Adoption of Hank*, 52 Mass. App. Ct. 689, 693 (2001), quoting from *Cormier* v. *Carty*, 381 Mass. 234, 237 (1980).

1. *Facts.* We summarize the judge's findings, supplementing them with additional facts not subject to dispute.

In the fall of 2000, the mother, then eighteen years of age,

---

[2]Abby's father, who signed an open adoption agreement, is not a party to this appeal.

began a relationship with Abby's father, then nineteen years old. At that time, the mother was living at the home of a family friend in return for providing child care for the friend's three children. The friend, a nurse, had been the mother's childhood baby-sitter.

The mother's parents had divorced when she was eight years old, and, as a child, she and her sister lived part of each week with each parent. Later, the mother lived only with her mother and stepfather, but, against their wishes, she moved out of their house after her high school graduation. The mother then attended a four-month training program to become an emergency medical technician (EMT). She passed the course and, while she was pregnant with Abby, became certified as an EMT.

The adults in the mother's life did not approve of the father. As the mother was aware, he had been in and out of foster care as a child and had a criminal record, including arrests for breaking and entering and assault and battery. After a month or so, the relationship between the mother and the father ended, but not before the mother became pregnant. Initially, the father encouraged the mother to have an abortion, telling her that he was not ready to become a parent. The mother decided not to have an abortion and to have the child.

Even though their dating relationship had ended, the father and mother remained in contact with each other during the mother's pregnancy, and the father was present at Abby's birth on July 21, 2001. The birth was a difficult one, as Abby presented with shoulder dystocia and suffered a broken clavicle during the delivery. By the father's own account (as well as that of the mother), shortly after Abby was born, he began to see her every day either at his house or at Abby's maternal grandmother's house, which was close by. The mother, however, was Abby's primary caretaker.

Though not included in the judge's findings, medical records and the testimony of Abby's family doctor show that the mother regularly brought Abby in for her routine check-ups as well as for appointments for medical issues such as ear infections and that she initially breast fed the baby. At none of these appointments did the doctor detect any signs of abuse or neglect; he

found both the mother and child to be clean, well-groomed, and appropriate in their behavior.

After Abby's birth, the mother and Abby continued to reside with the mother's family friend until September 1, 2001, when they moved in with the mother's mother and stepfather. On October 16, 2001, the mother began orientation and employment as an EMT, bringing Abby to the father and leaving her in his care for approximately eight hours per day.

At that time, the father lived with a friend and the friend's parents in a house where the father had his own room. There was a period when the mother spent several nights a week with the father, and they took turns tending to Abby during the night. These visits did not rekindle the parents' relationship; by this point, the father was seeing a new girlfriend.

On Monday, October 29, 2001, the mother dropped Abby off at the father's home at approximately 8:30 A.M., waking up the father when they arrived. Based on the father's testimony, the judge found that Abby was "cranky and irritable" throughout the day, behaving as she did when she was sick (Abby was prone to ear infections). The father's friend's parents were present in the house all day (they were disabled and ordinarily stayed in).

The judge found that, according to the mother, after she brought Abby home, the mother noticed that Abby was not moving her right leg. She also noticed, either at that time or on Sunday night, that Abby's cheeks were bruised. She tried to call Abby's physician but could not reach him, so she brought Abby to the emergency room at St. Vincent Hospital. The doctor who examined Abby detected no injury and sent the mother and Abby home, recommending that they visit Abby's physician the next day.

The next morning, the mother took Abby to her regular doctor, who noted that the child's right leg was swollen and hard. He referred the mother to the University of Massachusetts Memorial Hospital, where, initially, no injuries were detected and an infection was suspected. Only after a pediatric orthopedic surgeon was called in to analyze Abby's X-rays was it learned that Abby had suffered multiple fractures.

Abby was discovered to have sustained six fractures, located

in her ribs and her legs, as well as facial bruising and bruising around the fractures. Some of the injuries were of indeterminate age, but the director of the hospital's child protection program noted in her report that two of the fractures were healing, and one (a rib fracture) showed signs of being at least three weeks old. The medical findings were consistent with inflicted injury.

During Abby's week-long hospitalization, the father hesitated to visit, although ultimately he did so. He explained at trial that he was afraid that he would be blamed for Abby's condition. The mother reported that, after Abby's hospitalization, she had no contact with the father and wanted nothing to do with him. There is nothing in the record that indicates otherwise.

When the hospital discovered the extent of Abby's injuries, a G. L. c. 119, § 51A, report was filed, and the department became involved. The department identified a number of potential perpetrators, including, but not limited to, the mother, the father, the mother's mother and her husband, the mother's father, the mother's friend, the family with whom the father lived, the father's mother, and the father's sister, all of whom had spent time with Abby during the period when her injuries most likely occurred. At least in the beginning, suspicion focused upon the father, who, according to Abby's hospital record, told an investigating physician that he was aware that he sometimes could be too rough with the baby and told the initial court-appointed special advocate (CASA) that he was "90% sure he wasn't the one who hurt [Abby]." Because the department was unable to exclude the mother as a suspect, Abby was placed in the department's custody. The police also undertook an investigation, but no one was charged.

The mother's maternal uncle and his girlfriend volunteered to serve as kinship foster parents for Abby. While they waited to be approved by the department, Abby was released from the hospital into a so-called "fresh start" foster home. The judge found, based on the testimony of the fresh start foster mother, that the back of Abby's head was flat and that she had an unemotional affect. On November 21, 2001, Abby entered the kinship foster home, where the mother's uncle and his girlfriend made similar observations. For the first few months, the kinship foster parents permitted the mother to visit regularly and frequently.

Though not included in the judge's findings, the following facts are uncontroverted. The mother fully complied with the department's service plan, which included taking parenting classes, working with a parent aide, and undergoing a psychological evaluation. She sought therapeutic counseling on her own initiative; later, it was added to her service plan, and she continued with it. She remained employed as an EMT, provided the kinship foster parents with money for child support and consistently and frequently visited Abby. She and members of her extended family also met with a church affiliated social service organization and signed a family "contract" that established a support network for her and Abby. The mother was seen on many occasions, both alone and with Abby (eighteen visits were with the mother and child together), by a case manager for the Massachusetts Society for the Prevention of Cruelty to Children. Two consecutive volunteer investigators from CASA were involved with the case. They saw nothing in the mother's behavior that concerned them.

At the department's request, a psychologist evaluated the mother, prepared a report, and testified at trial. The judge found, based on the psychologist's testimony, that the mother had a "personality disorder," that is, "that she has some traits that are so inflexible that they interfere with her adjustment"; that she had some "dissociative functions," meaning that there was separation between different areas of her psychological functioning; and that work, rather than personal relationships, would be her strong point.

The judge also found, based on the foster parents' testimony, a number of shortcomings on the mother's part. For example, she found that the child did not smile or gurgle when she first came into the foster parents' care; that there were episodes where the mother seemed impatient or inattentive to Abby; that the mother held the child "facing out[]"; and that the foster parents were concerned that the mother seemed overly committed to her work.

Much of the trial revolved around the extent of the mother's visitation with Abby. Although, in the beginning, the foster parents were generous in permitting visitation, as time went on, they took steps that impeded the mother's access to her child.

For two lengthy periods of time, they refused to allow visits in their home, leaving the mother to see Abby only at times and places arranged by the department. The first time the foster parents cut off visits was in February or March of 2002, because they found the mother to be inattentive and unreliable; among other things, she had been late, had used their telephone, and had brought along a friend without first obtaining the foster parents' permission.

It was several months before the foster parents allowed the mother to resume visits at their home. Starting in August, 2002, the mother was permitted to come over once per week; and by October, 2002, she was allowed to come every weekday, at 5:30 A.M. (later modified to 6:00 A.M.), to get Abby ready for day care before the mother and the foster parents had to go to work. Eventually, through the department, the mother also obtained longer, unsupervised visits, twice per week.

The second time the foster parents cut off visits at their home was in February, 2003. The judge found, as recounted by the foster parents, that the mother failed to be consistently timely; that she failed to call if she was going to be late; and that she failed to seek or accept extra visits.

In February, 2003, the department's goal, which had been reunification, changed to termination of the mother's parental rights. The trial judge did not specifically address the change in goal, but from her findings and the CASA report on which those findings were based, it appears that the following occurred. Abby's attorney called the police to make inquiries and express concerns about the dormant investigation into Abby's injuries. As a result of this contact, the mother, but not the father, was interrogated again (he declined to be interviewed); and, although the mother offered to take a lie detector test, one never was administered. The renewed investigation resulted in no new evidence, but the police officer who conducted the investigation nevertheless called the department to report her feelings about the mother.[3] The officer explained her suspicions

---

[3]According to the CASA report, the officer stated that "of course [the father] is the likely suspect," but his affect and response during the investigation (he put his head in his hands and cried) seemed more genuine to her than

to the CASA worker by saying "it came down to who had care of [Abby] all of the time."

The department thereupon terminated the mother's unsupervised visitation and officially changed the goal to adoption by the foster parents. The department's service plan for the period from February 24, 2003, to August 24, 2003, indicates that the change in goal was due to concerns of the police and "the length of time [Abby] has been in care."

In late May and early June, 2003, the case was tried over an eight-day period. The mother, then twenty-one years old, was renting her own apartment in a residential neighborhood not far from her extended family. She remained employed as an EMT and continued to see a therapist and to meet with a parent aide assigned by the department. As a result of a court order that she had obtained a few months earlier, her unsupervised visitation had been reinstated. She therefore had been seeing Abby twelve hours per week, unsupervised, subject to unannounced monitoring. All visits took place without incident, and there were no safety concerns on the part of anyone connected with the case.

2. *Discussion.* Judges have few more solemn responsibilities than their consideration of cases brought to terminate parental rights. "The '[r]emoval of children irrevocably from their biological parents is an exceptionally far reaching exercise of State power . . . . In recognition of the constitutionally protected interest of parents in maintaining the natural bond with their children, a judge must find by clear and convincing evidence that a parent is currently unfit to further the child's best interest.' " *Adoption of Iris*, 43 Mass. App. Ct. 95, 102 (1997), *S.C.*, 427 Mass. 582 (1998), quoting from *Adoption of Katharine*, 42 Mass. App. Ct. 25, 27 (1997). "[T]he judge's assessment of the weight of the evidence and credibility of the witnesses is entitled to deference." *Custody of Eleanor*, 414 Mass. 795, 799 (1993). Such deference requires that the judge make "specific and detailed findings demonstrating that close attention has been given to the evidence." *Adoption of Quentin*, 424 Mass. 882, 886 (1997). A judge's findings will not be

that of the mother (she initially was controlled and later was thought to cry in a way that was "frustrated" and "angry").

disturbed unless shown to be clearly erroneous. *Custody of Eleanor, supra.* "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Ibid.*, quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).

In this case, we are troubled by a substantial number of the judge's subsidiary findings. We consider many of the most crucial findings to be clearly erroneous: some are grounded in an exaggerated interpretation of portions of the record; some are contradictory; and others find no support in the record whatsoever. We comment on those findings that are particularly germane to the question of fitness.

We begin with the judge's most significant finding — that the mother was the perpetrator of Abby's injuries because she and she alone was caring for Abby when the injuries were inflicted. While medical reports estimated that the first of Abby's fractures occurred at least three weeks before she was hospitalized (around October 9, 2001) and that her more immediate injuries were inflicted at some time the day before her admission to the hospital, these time frames did not leave the mother as the only potential perpetrator. At least one other suspect, Abby's father, had extensive access to the child during both periods. The judge's finding that the father was never left unsupervised at these times is not supported by the record and is inconsistent with the testimony of both the mother and the father.[4]

The only evidence from which it could be inferred that the timing of Abby's injuries pointed only to the mother is an excerpt from one of the CASA reports, summarizing the CASA

---

[4]The department points to an exchange where the father was asked at what times he "had" Abby when the mother was not around, and replied, "while she was at work." In the context of his other testimony about his daily access to Abby before he began providing day care, this response cannot fairly be said to mean that the father was never left unsupervised with Abby until the mother returned to work. Although, as noted above, the people with whom the father was living were in the house on the day before Abby was admitted to the hospital, the father testified that he spent time alone with Abby bathing her and caring for her in his room.

investigator's interview with the director of the child protection program at University of Massachusetts Memorial Hospital. When asked about the bruises that were apparent on Abby's face at the time of her admission to the hospital on Tuesday, October 30, the doctor reportedly said that "with bruising one could expect to see some change approximately 12-24 hours after an injury, as generally bruising may not show immediately." Essentially taking this estimate as a hard and fast rule, the judge found that Abby's facial bruises must have been inflicted during the preceding weekend, October 27 and 28, 2001, while the mother was Abby's sole caretaker, rather than on Monday, October 29, while Abby was in the care of the father. The judge reached this conclusion even though the father's care of Abby fell outside the doctor's rough guideline by at most two hours, and even though other bruises that appeared on Abby's legs were indicative of abuse occurring on the father's (as well as the mother's) watch, since they did not show up until Tuesday. This rough estimate is too slender a basis on which to find that only the mother could have been the perpetrator. See *Adoption of Iris*, 43 Mass. App. Ct. at 102.

In the alternative, the judge found that, even if the mother did not inflict Abby's injuries, she was "clearly reckless" in allowing the child to be injured. A theme promoted by the department, and accepted by the judge, was that the mother had forced the father to care for the child, even though the mother should have known (from his criminal record, from his initial suggestion of an abortion, and from the fact that people close to the mother expressed general disapproval of him) that he would not be a fit caretaker. The evidentiary basis for this theme was a note in one of Abby's hospital records that the mother "reported that she discussed plans to go to court to receive child support from dad if he could not care for [Abby] while mom was working." The department construed this to mean, and the judge found, that "the mother gave the father two choices: he could either provide daycare for [Abby] while [the mother] was at work, or he had to pay child support" and that the mother therefore "coerced" the father into caring for Abby.

The judge's inference that the child's injury was a result of the mother's "recklessness" is unwarranted on this record. The

evidence indicates that the father became involved with Abby before he was called upon to provide day care; and, despite his criminal record, there was no reason for the mother to anticipate that he would be abusive to Abby.

The evidence also was insufficient, as the department recognizes, to warrant the judge's finding that the mother was negligent in failing to discover the injuries inflicted upon Abby. The medical evidence was uncontradicted that injuries of this nature are not easily detected in an infant. Abby's regular doctor and other medical professionals failed to find Abby's injuries on a number of occasions, and the final diagnosis came about only because of the mother's persistence in seeking medical attention for her child. Even after Abby's hospitalization, it took review of Abby's X-rays by a trained specialist before the fractures were discovered.

While we do not question the judge's finding that the mother suffers from a personality disorder, it was not proved that the mother's psychological profile prevents her from being a fit parent. There was no evidence, expert or otherwise, from which to conclude, as did the judge, that the mother's condition was such that she was unlikely to provide minimally acceptable care of her child.[5] See *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 764 (1998).

The findings included in the judge's analysis of the statutory factors are also problematic. That the mother maintained only "sporadic contact" with Abby in the six months preceding trial is without foundation and contradicted by the evidence. The department's bonding expert (who favored adoption by the foster parents) was among those who acknowledged that the mother had maintained regular visitation with Abby.[6] The judge's finding that the mother failed to utilize department

[5]The testimony of one of the department's experts (a social worker who opined about bonding and attachment) falls far short of meeting this standard. The department's other expert, the psychologist who evaluated the mother, testified that, irrespective of her personality disorder, the mother was exceptionally responsive and comfortable with Abby and showed no signs of cruelty, sadism, or aggressive impulsivity.

[6]Concerns around visitation centered upon whether the mother sought extra visits beyond those offered to her. For example, it was noted that the mother failed to seek extra visitation from the foster parents during a period of a

services likewise is in conflict with the evidence, including evidence submitted by the department. The mother's case worker testified that the mother fully complied with all of the tasks on the service plan and, in addition, made use of services from other sources.

Stripped of the clearly erroneous findings, what remains on the question of unfitness are a large number of findings based upon episodes where the mother's parenting style was called into question. Because these findings have support in the evidence and depend in part upon credibility assessments, we do not consider them to be clearly erroneous.[7] However, these findings do not rise to the level of establishing the mother's current unfitness to parent Abby. They do not reflect the "grievous shortcomings" that must underlie a finding of parental unfitness. *Adoption of Katharine*, 42 Mass. App. Ct. at 28, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975).

While we also do not question the judge's finding that Abby

couple of days when she was out of work because of a bad back and that she did not ask for an extra visit when Abby was sick. At the same time, the mother was criticized for insisting upon a visit on another occasion when Abby was ill.

[7]Crediting the foster parents, the judge found, inter alia, that on one occasion when five month old Abby was crying, the mother said "stop it" and "get over yourself" and did not pick her up; that during another visit, the mother did not respond when Abby tried to get her attention by hitting the mother's leg; that on another occasion when Abby was crying (at six or seven months of age), the mother said, "Just a minute, I've got a couple of bites left," and continued eating, leaving the foster mother to go to her; that the mother failed to prepare and feed Abby a second packet of oatmeal on an occasion when the foster mother indicated that Abby was asking for more; and that the mother made Abby scrambled eggs even though the foster mother had told her that Abby did not like eggs.

The judge also made findings consistent with the observations of the department's bonding expert that the mother persisted in offering to help Abby eat food (spaghetti-o's) even after Abby tried to push her away. The judge found, again relying on the expert, that the mother's inability to respond to the child's nonverbal cues would hamper the child's ability to develop appropriate skills. Other findings credited the father's testimony that Abby often had a dirty diaper when the mother brought her to his house and that there was one instance when Abby arrived with excrement running down her leg.

would be traumatized by separation from the foster parents, this finding, while supportable, does not suffice to meet the standards that are required if severance of bonds is to be "a decisive factor" in termination of parental rights. See *Adoption of Katharine*, 42 Mass. App. Ct. at 30-31. In such a case, "a judge would be bound in findings to describe the nature of the bonds formed, why serious psychological harm would flow from the severance of those bonds, what means to alleviate the harm had been considered, and why those means were determined to be inadequate." *Ibid.* As the New Jersey Supreme Court has discussed in some detail, there is significant controversy among social scientists about theories of parental bonding, and a risk that bonding considerations "may be misused to determine only which set of parents is optimum or even 'better' in some vague social sense, rather than capable of rearing the child without serious harm." *In re Guardianship of J.C.*, 129 N.J. 1, 21 (1992). We are concerned that this may have occurred here.[8]

3. *Conclusion.* "While [Abby's] welfare and best interests were undoubtedly the central focus of both the judge and the department in their desire to spare her the risk of further injury, good intentions and genuine concern are not a satisfactory substitute for clear and convincing evidence." *Adoption of Iris*, 43 Mass. App. Ct. at 102. The decree terminating the parental rights of the mother is vacated. We remand the matter for further

---

[8]It appears from the evidence that while the kinship foster parents originally were committed to the reunification of the mother and Abby, they grew increasingly irritated with the mother and extremely attached to Abby. Thus, as time went on, the case took on the overtones of a custody dispute between family members. Viewed purely as a contest between the mother and the foster parents, the foster parents unquestionably had much to offer Abby. The mother's uncle is prominent in his town. He works for the department of public works, serves on the planning board, is a volunteer fire fighter, and both he and the foster mother, a research associate, have solid incomes. Although they have had difficult periods in their relationship and, at the time of trial, had no current plans to marry, the foster parents expressed their commitment to raising Abby together. They also each have a child from prior relationships. These children visit them often and would provide a larger nuclear family for Abby. The pivotal issue, however, was not which home might be a more desirable setting in which to raise a child, but whether the mother was incapable of meeting Abby's needs.

proceedings consistent with this opinion,[9] including a hearing forthwith to reinstate the mother's visitation with Abby under appropriate terms and conditions[10] and to determine whether the department's goal remains the termination of parental rights. If so, the judge shall determine whether the department has new evidence of the mother's unfitness to be reunited with Abby, and, if it does, to proceed promptly to trial consistent with this opinion. If a new trial is not warranted or if the department's goal has changed, a plan for the reunification of the mother and Abby under appropriate terms and conditions, taking into account the best interests of the child in regard to the method and timing of such transfer, shall be devised and implemented with judicial oversight and approval.

*So ordered.*

---

[9]It appears that the extent of the father's parental rights as to Abby may be an open issue. Because he signed an open adoption agreement shortly before trial, the trial was limited to the mother. The agreement itself is not contained in the appellate record, but the father's colloquy with the judge suggests that it was to remain in force only if the mother's rights were terminated.

[10]We do not know whether the mother has had the opportunity to remain in contact with Abby pending appeal. The judge's decision left visitation to the discretion of the preadoptive parents, and the mother's motion for a visitation order pending appeal was denied.