ADOPTION OF LELAND.[1]

No. 05-P-898.

Hampden. November 3, 2005. - February 24, 2006.

Present: LAURENCE, GRASSO, & DOERFER, JJ.

*Parent and Child,* Care and protection of minor. *Adoption,* Care and protection. *Minor,* Care and protection, Adoption.

In a care and protection proceeding in Juvenile Court, the judge's findings, taken together, did not prove the father to be currently unfit by the requisite clear and convincing evidence. [583-588]
This court declined to address on appeal issues not properly raised in the trial court. [588]

PETITION filed in the Hampden County Division of the Juvenile Court Department on July 17, 2001.

The case was heard by *Patricia M. Dunbar,* J.

*Catherine C. Sinnott* for the father.

*Brian Pariser* for Department of Social Services.

*Lisa M. Kling* for the child.

DOERFER, J. The father of Leland, who was born on January 4, 2000, appeals from a decree of the Juvenile Court finding him currently unfit to care for his son, awarding permanent custody to the Department of Social Services (DSS), terminating his parental rights, and adopting DSS's permanency plan while denying the father's petition for guardianship of the child. We agree with the father that the subsidiary findings taken together do not prove the father to be currently unfit by the requisite clear and convincing evidence.[2]

---

[1] A pseudonym.

[2] The father makes a number of arguments for the first time on appeal, which we view as waived. See *infra.* In addition, because of our resolution of the case, we do not address the father's argument that the trial judge shifted the burden of proof to the father, nor do we address his argument that racial

*Procedural history and background.* We summarize the relevant facts and procedural history as set forth in the trial judge's decision and as supported by the record. The mother[3] and father had a brief relationship during which the child was conceived. Unaware of the pregnancy and birth of the child, the father encountered the mother and child in April, 2000, in Springfield. The mother told the father that the three month old baby was his son. That day he took the baby to his parents' home in Connecticut, where the father was living. For approximately the next fifteen months, the child lived with the father and his family[4] in Connecticut, but was returned to the mother in Springfield for weeks at a time.

On July 17, 2001, DSS filed a care and protection petition on behalf of Leland and his younger brother (who has a different father and who is not involved in the current appeal). The care and protection petition was based upon a G. L. c. 119, § 51A, report, which was supported by a G. L. c. 119, § 51B, investigation, alleging neglect by the mother, not the father.[5] The allegations mostly focused on medical neglect of Leland's younger brother.[6] According to the father, when DSS filed the petition, it used the following ruse to take Leland into its temporary

---

bias prejudiced the outcome of the case.

[3]In January, 2004, the mother agreed to the termination of her parental rights, and she is therefore not part of this appeal.

[4]The transcript indicates that either six or seven people, including the father and his son, as well as two other children, were living in the grandparents' three-bedroom apartment at that time. The father and his son shared a bedroom.

[5]The petition identifies the father by name and lists his address simply as "Waterbury, CT," but does not include his date of birth or social security number. The petition states, "It is important to note that during this time, [Leland] has not been seen due to being with his father in Connecticut for a visit. Mother could not produce address or phone number."

[6]The father is only mentioned in passing in the G. L. c. 119, § 51B, report as "the oldest son's father" who lives in Waterbury, Connecticut. Leland, too, is barely mentioned in the report: while the report notes that "[Leland] is behind on his shots" and that the "[m]other has not followed through medically with the children," the report also describes Leland as "clean, well dressed, and free of any visible marks and bruises. [H]e would smile at [the social worker], but he was more attentive to [the] mother as she was giving him pizza. He appears healthy."

custody.[7] An anonymous DSS representative called the father in Connecticut and told him there was an urgent need for him to bring the child to Massachusetts. He was told to bring the child to the maternal grandmother's house in Springfield. DSS did not disclose to the father the reasons why he urgently needed to bring the child there. When the father and child arrived, two DSS representatives and five uniformed police officers were at the grandmother's house and took the child into DSS's custody.[8]

On January 3, 2002, the judge ordered paternity to be established by January 9, 2002. Following that order, the father filed a complaint to establish paternity. On January 16, 2002, the judge allowed the father's motions for genetic paternity testing and funds. Paternity was officially established more than twenty months later on October 3, 2003.[9]

On January 30, 2002, the judge ordered a home study and criminal offender record information (CORI) checks. On March 22, 2002, a foster care review determined that the father's compliance with his service plan was insufficient.[10] On June 25, 2002, prior to the determination of paternity and the institution

[7]Presumably, DSS took custody of Leland on July 18, 2001, when personal service of the care and protection summons was made on the father.

[8]The father ultimately waived the temporary custody hearing on August 22, 2001.

[9]Neither the record nor the findings clarify why this lengthy delay occurred, but the record indicates some confusion as to the correct process. On July 18, 2002, the father came to Massachusetts for genetic testing. On September 13, 2002, the Department of Revenue wrote a letter to DSS stating that paternity was positively determined. The father's motion for adjudication of paternity was allowed on October 25, 2002, but then vacated because the mother had not been served with a notice of that motion. One year later, on October 3, 2003, the judge granted the father's motion (filed on September 30, 2003) to establish his paternity. In her decision, the trial judge made contradictory statements: in the introduction, the judge stated that the father "did not become adjudicated as father of the child until November of 2002," but in a later finding stated that he "was adjudicated to be the father" on October 3, 2003. (When citing the earlier date, the judge may have had in mind the original voided adjudication of October 25, 2002.) In any event, blame for that nearly one-year delay should not fall on the father.

[10]One month before this foster care review, a service plan dated February 4, 2002, included the following: (1) "Meet with DSS worker for assessment and Service Planning"; (2) "Become adjudicated as [Leland's] father"; and (3) "Additional tasks to be added once assessment is completed." In a later service plan dated February 13, 2003, those additional tasks were outlined.

of visits, DSS changed its goal from reunification to adoption.[11] The father moved for visitation on July 8, 2002. That motion was allowed.

The judge allowed a motion for an Interstate Compact on the Placement of Children (Interstate Compact) home study on November 6, 2002. The judge found that the State of Connecticut denied the father as a "placement source" because too many people were living in the home. On June 17, 2003, the paternal grandparents filed a petition for guardianship of Leland, with the written consent of the father and mother. The judge allowed the father's emergency motion for a priority Interstate Compact home study on June 25, 2003. The judge found that Connecticut denied the request due to the grandparents' prior history with DSS. Upon the father's motion, the guardianship petition was consolidated with the care and protection petition on October 13, 2003. The trial occurred on January 21, 2004, and on April 22 and 23, 2004. The father filed a timely appeal.

*Discussion.* In termination of parental rights cases, the trial judge must make specific and detailed findings demonstrating that close attention has been given the evidence. See *Custody of Eleanor*, 414 Mass. 795, 799 (1993). While subsidiary findings must be proved by a fair preponderance of the evidence, taken together these findings must prove parental unfitness, which is the "critical inquiry," by clear and convincing evidence. *Care & Protection of Laura*, 414 Mass. 788, 793 (1993). "Troublesome facts . . . are to be faced rather than ignored . . . . Only then is the judge's conclusion entitled to the great respect traditionally given to discretionary decisions. *Adoption of Stuart*, 39 Mass. App. Ct. 380, 382 (1995), quoting from *Adoption of a Minor (No. 2)*, 367 Mass. 688-689 (1975)." *Adoption of Abby*, 62 Mass. App. Ct. 816, 817 (2005).

As the critical inquiry, a determination of current parental

---

[11]Though the judge's finding is supported by the record, a DSS social worker testified (in a decision she was not a party to) that the goal was changed from reunification to adoption in October, 2002. A service plan for the period of August 12, 2002, to February 12, 2003, identifies adoption as the goal with a start date of August 5, 2003.

unfitness is not focused upon "whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child." *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 761 (1998). "Parental unfitness . . . means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent. Rather, the idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare much at hazard. (Footnotes omitted.) *Adoption of Katharine*, 42 Mass. App. Ct. 25, 28 (1997), quoting [from] *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975)." *Adoption of Greta*, 431 Mass. 577, 587 (2000).

The subsidiary findings of fact[12] relating to the father's fitness are limited: in a foster care review in March, 2002, the father's compliance with the service plan was deemed insufficient because he failed to provide drug screens or to undergo a domestic violence evaluation or parenting assessment. He did not maintain regular contact with DSS and his son, and missed scheduled visits and visited sporadically. Neither he nor the paternal grandparents sent Leland any cards, gifts, pictures, or letters. In the November, 2002, home study conducted at the father's request, "Connecticut had denied [the father] as a placement source because there were too many people living in the home."

Even assuming that these subsidiary facts were proved by a preponderance of the evidence, supported by the record, and not clearly erroneous, see *Adoption of Greta*, 431 Mass. at 587, they do not support an ultimate finding of current parental unfitness by clear and convincing evidence. These findings do not support clearly and convincingly that there is either a history of abuse or neglect or a prognostication of such abuse or neglect in the future. See *Care & Protection of Bruce*, 44 Mass. App. Ct. at 763-764 ("ultimate finding of unfitness and the

---

[12]Many of the forty-one findings of fact focus upon background information and describe the mother's medical neglect, lack of understanding of basic parenting skills, and cognitive limitations.

extreme step of taking a child away from a [father] . . . required either history of abuse or neglect or prognostications that are more firmly based than those offered by the experts [a psychiatrist and a psychologist]"). Compare *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262 (1996) (the record and subsidiary findings of current imprisonment, history of criminal recidivism, and alcoholism supported ultimate finding of the father's unfitness at the time of trial or within any relevant future period). Taken together, the findings here do not show "grievous shortcomings or handicaps that put the child's welfare much at hazard," *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 646, and thus the ultimate finding of unfitness is not properly supported by the findings. See *Adoption of Abby*, 62 Mass. App. Ct. at 827; *Adoption of Yale*, 65 Mass. App. Ct. 236, 240 (2005).

Reliance upon the denial of the father as a placement source due to "too many people living in the home" does not provide strong support for terminating the father's parental rights in this case. Six or seven family members living in the grandparents' three-bedroom apartment does not, on its face, appear to be so overcrowded as to create a situation of abuse or neglect. Parents may not be deprived of custody "simply because their households fail to meet the ideals approved by the community . . . [or] simply because the parents embrace ideologies or pursue life-styles at odds with the average." *Custody of a Minor (No. 2)*, 378 Mass. 712, 719 (1979). Poverty is not a reason upon which to base a determination of unfitness. *Care & Protection of Three Minors*, 392 Mass. 704, 714 n.12 (1984). Furthermore, the findings that the grandparents had a prior history with DSS was no longer relevant to determining the father's current fitness. At the time of trial, the father testified that he no longer lived with his parents, that he lived in an apartment with his fiancée and baby daughter and stepdaughter, and that he had steady employment.

While failure to follow service plan tasks and visitation schedules may be relevant to determining parental unfitness, *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987), it is not clear here why certain tasks were required of the father and, more

importantly, how the tasks relate to his fitness as a parent. See *Adoption of Yale*, 65 Mass. App. Ct. at 242. Furthermore, finding twenty-four, in which the judge stated that the father was supposed to cooperate in drug screening, is incorrect. The service plan states that the father must "cooperate in drug screening, if there are any drug related charges on his CORI." His juvenile record does not contain any drug-related charges, and the DSS social worker agreed that there were no drug-related charges on his CORI. DSS concedes this point in its brief.[13]

The judge found that the father "believed that he had complied with the parenting assessment component by visiting with his child sporadically." The judge did not comment on what else was expected to fulfil this task, and the testimony does not shed light on the matter.[14] Furthermore, testimony by the DSS social worker reveals that the Department of Children and Families in Connecticut did not have concerns about the father's ability to parent, and outside of the Interstate Compact home study, the Connecticut authorities have never been involved in any case relating to him as a parent.

The findings relating to sporadic visits, while not clearly erroneous, suffer from a lack of close attention to the evidence. See *Care & Protection of Olga*, 57 Mass. App. Ct. 821, 823 (2003), quoting from *Adoption of Harriet*, 29 Mass. App. Ct. 111, 112 (1990) ("It is critical . . . that the judge's decision reflects 'careful factual inspection [of the evidence] and specific and detailed findings' "). While the record shows the father canceled or failed to attend some visits, it does not acknowledge the father's efforts to attend these visits. The father originally experienced problems in being permitted visitation by DSS

---

[13]DSS states, "The service plan drafted by [DSS] technically required drug screens if [the father's] CORI included drug related offenses, . . . and therefore in this case did not mandate such testing, as the service plan was written. However, with this one exception, [the findings] remain sound as regards all of the other tasks . . . ."

[14]Testimony by the DSS social worker does not show why the father's belief was unreasonable. In response to the question of how the parenting assessment was to take place, the DSS social worker testified, "He was to come to the office for a scheduled visit with [Leland], and he was to meet with someone who was experienced in doing parenting assessments, and he was supposed to interact with [Leland]."

because he had not been adjudicated the father. The father eventually filed a motion with the court for visitation, which the judge allowed. DSS social workers, however, canceled numerous visits and did not call the father to reschedule. When visits did occur, they went well, and the child enjoyed them. After initially permitting the grandparents to attend visits, DSS halted the practice because, the social worker testified, DSS wanted the social worker to observe the father interact with the child. The grandparents had often provided the father with a ride to the visits in Massachusetts so that they could see their grandson.

The judge also found that the father had not undergone a domestic violence evaluation and, though the father claimed he did not have the funds for that evaluation, the DSS social worker had requested those funds. This finding is not clearly erroneous.[15] However, the basis for making a domestic violence evaluation part of the service plan is unclear from the findings. It appears from our review (the trial judge did not make findings in this regard) that DSS's concerns derived from incidents that occurred when the father was an adolescent, mostly between the ages of eleven and thirteen years old.[16] (He was twenty years old at the time the task was included in his service plan and twenty-one years old at the time of trial.) These incidents did not involve the mother or other romantic relationships. Even were there an appropriate basis for such a requirement, the father's failing to undergo the domestic violence evaluation, based upon the circumstances of this case, shed little light on his parental fitness. Notwithstanding the deference given to the

---

[15]We note that while a trial judge is not required to believe or credit witness testimony, and we give deference to a judge's credibility determinations, *Custody of Eleanor*, 414 Mass. at 799, the testimony of both the father and the DSS social worker reveal that the father did show up for his first scheduled domestic violence evaluation appointment, but did not have the funds to pay for it. The social worker testified that she then sought funding for the father, who then failed to appear at his next scheduled appointment.

[16]The social worker testified that DSS requested the domestic violence evaluation "based upon his CORI and also based on the previous records that the parents had with DSS." In one incident, the father had acted out during a dispute with the grandmother and cut the couch with a knife in anger. In another incident, charges were pressed against the father based upon a fight he had while trying to defend his sister, who was eight months pregnant at the time. Additionally, the CORI contains entries related to charges including vandalism, breaking and entering, and larceny.

weight a judge gives the evidence, and given the limited number of findings addressing the father's unfitness, this finding in conjunction with the other findings is not sufficient to support the ultimate finding of unfitness. See *Custody of Eleanor*, 414 Mass. at 799, 800.

*Other issues.* For the first time on appeal, the father makes the following arguments. Because the Interstate Compact does not apply if a parent sends a child to the other parent in another State, see St. 1963, c. 452, art. VIII, the father argues that DSS's obtaining custody of Leland when the child had been with the father in Connecticut violated the Interstate Compact. He further contends that, to remedy that violation, the Juvenile Court judge should have, based on principles of equity, returned Leland to his father's custody in Connecticut notwithstanding the requirement of the Interstate Compact that Connecticut approve the father's home as a placement for Leland. St. 1963, c. 452, art. III(d). Finally, the father argues that the actions of DSS in luring him to Massachusetts in order to take custody of the child, see *supra*, were an egregious violation of the father's due process rights under the Fourteenth Amendment to the United States Constitution.

Since these issues were not properly raised in the trial court, we decline to address them here. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 393 Mass. 696, 697 (1984); *Adoption of Mary*, 414 Mass. 705, 712 (1993).[17] The father waived his right to a seventy-two hour temporary custody hearing during which he could have presented his concerns, see *Care & Protection of Manuel*, 428 Mass. 527, 528-529 (1998), and he was given an opportunity to be heard "at a meaningful time and in a meaningful manner." *Adoption of Simone*, 427 Mass. 34, 39 (1998), quoting from *Armstrong* v. *Manzo*, 389 U.S. 545, 552 (1965).

*Conclusion.* Because the judge's findings do not support the conclusion of parental unfitness, the decree terminating the father's parental rights is vacated. The matter is remanded for further proceedings forthwith to reinstate, under appropriate

---

[17]Our declining to address those issues should not be taken as tacit approval of the manner in which DSS removed the child from his father. There was nothing to suggest that the child's safety was at issue.

terms and conditions, the father's visitation with the child. See *Adoption of Iris*, 43 Mass. App. Ct. 95, 106 (1997); *Adoption of Abby*, 62 Mass. App. Ct. at 829. If DSS determines that its goal remains the termination of the father's parental rights, the judge must determine whether there is sufficient new evidence to warrant a new trial. *Ibid.* If it is determined that reunification is appropriate, the method and timing of such transfer shall be devised and implemented with judicial oversight and approval. *Ibid.*

*So ordered.*