This is a summary process action brought by Mae Lindquist against her tenant, Steve Stella. After a bench trial, a Housing Court judge ruled in Stella's favor on his counterclaims for breach of the implied warranty of habitability, illegal utility charges, retaliation, discrimination, and violation of G. L. c. 93A and awarded him $48,242.25 in damages and $7,000 in attorney's fees. Lindquist appeals.
After careful review of the record, we conclude that the judge's findings, which she adopted from the parties' proposed findings, do not reflect a meaningful consideration of the evidence. The judge accepted one proposed finding that Stella now concedes is clearly erroneous, and she otherwise failed to resolve discrepancies in the evidence, including some that call Stella's credibility into question. For these reasons, as detailed further below, we vacate portions of the judgment and remand the claims for breach of the warranty of habitability, illegal utility charges, and violation of G. L. c. 93A for further findings, and the retaliation claim for recalculation of damages. On the discrimination claim, we conclude as a matter of law that judgment should enter in Lindquist's favor, and that portion of the judgment is reversed.
Discussion. "On review of a jury-waived proceeding, we accept the judge's findings of fact unless they are clearly erroneous." South Boston Elderly Residences, Inc. v. Moynahan, 91 Mass. App. Ct. 455, 462 (2017), quoting from U.S. Bank Natl. Assn. v. Schumacher, 467 Mass. 421, 427 (2014). A finding is clearly erroneous when there is no evidence to support it or when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Jablonski v. Casey, 64 Mass. App. Ct. 744, 747 (2005), quoting from United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). In this case the judge adopted a majority of Stella's proposed findings and some of Lindquist's proposed findings and issued rulings of law. Although this was permissible, we apply "stricter scrutiny" to the judge's adopted findings because we have doubt whether they "are the product of [her] independent judgment." Cormier v. Carty, 381 Mass. 234, 237-238 (1980). See Adoption of Abby, 62 Mass. App. Ct. 816, 817 (2005).
1. Implied warranty of habitability. The implied warranty of habitability requires that a landlord maintain a rented unit in compliance with the State sanitary code (code). See South Boston Elderly Residences, 91 Mass. App. Ct. at 462. If a tenant establishes a breach, he may be entitled to a rent abatement. See ibid. Here, the judge awarded Stella "a 30% abatement in the rent from April 2011 through May 2016 due to the rotting front and rear porches."[2] On appeal Lindquist does not contest that the condition of the front porch constituted a breach of the warranty of habitability. She focuses her challenge on the applicable time period, arguing that the judge clearly erred in finding that Stella's tenancy commenced in April of 2011 and then in calculating damages from that date.[3]
We agree that the judge committed clear error. Indeed, Stella concedes that the evidence did not support the judge's finding (adopted from Stella's proposed findings) that his tenancy began in April of 2011. The evidence is undisputed that Lindquist did not even purchase the property until June of 2011. Thus, at a minimum, the damages award must be reduced by the corresponding amount.
But that is not the end of the matter. The judge also adopted Stella's proposed finding that "since the inception of his tenancy, there have been problems with both the front porch and back porch," including "loose boards and rotted wood," "rusted railings," and "lolly columns" that were "giving way and rotting." These issues, however, were first documented by city inspectors in the spring of 2016, nearly five years after Stella's tenancy commenced. It is true that Stella testified that the porches had problems from the start, but he also testified that the problems "had progressively gotten worse since [he] was there." In addition, the judge failed to account for evidence that an independent third party, a city inspector, observed in January of 2016 that the "side porch" was in disrepair, yet reported no issues with the front porch.
In light of this evidence, and after reviewing the record as a whole, we are unable to determine the basis for the judge's finding that the issues documented by the inspectors in 2016 existed "since the inception of the tenancy." "[N]ot every defect gives rise to a diminution in rental value," McKenna v. Begin, 5 Mass. App. Ct. 304, 308 (1977), and even "the existence of a code violation by itself does not necessarily entitle a tenant to a finding that a material breach of the warranty of habitability has occurred." South Boston Elderly Residences, 91 Mass. App. Ct. at 463-464. The judge did not grapple with the issue of when the defects in the porches became serious enough to rise to the level of a material breach. We therefore remand this claim for further findings and recalculation of damages, including whether multiple damages and attorney's fees are warranted under G. L. c. 93A.
2. Illegal utility charges. General Laws c. 186, § 14, as appearing in St. 1973, c. 778, § 2, prohibits a landlord from "transfer[ring] the responsibility for payment for any utility services to [a tenant] without his knowledge or consent." A person who violates this prohibition is subject to criminal penalties and "shall also be liable for actual and consequential damages or three month's rent, whichever is greater, and the costs of the action, including a reasonable attorney's fee." Ibid.
Here, there is no dispute that Lindquist transferred the responsibility for cross-metered utilities to Stella; the issue is whether she did so without Stella's knowledge and consent. On this point the judge found that Stella learned of the cross-metering "only recently, from the [city's] [b]oard of [h]ealth." This finding is clearly erroneous. Although Stella testified that city inspectors told him that there was cross-metering, he did not testify that that was the first time he learned of it. There is evidence, moreover, suggesting to the contrary. Intake notes from the city show that on March 23, 2016, Stella telephoned to complain about "possible cross-metering," stating that "he ha[d] been paying for common lights" and that the conditions existed for "[one] year."[4] Stella acknowledged on cross-examination that he is a master electrician and "know[s] all about electricity." In addition, Lindquist's son, Russell Shepard, testified that, at the start of Stella's tenancy, he and Stella together installed the common area smoke detectors and Stella wired them into his electrical box. Shepard also testified that Stella agreed to pay the common area utilities for a reduced monthly rent.
The judge's adopted findings do not reflect any meaningful consideration of this evidence. See Adoption of Abby, 62 Mass. App. Ct. at 817 ("When adopted findings silently reject contrary evidence, it is difficult to know whether the judge actively chose to reject that evidence" [quotation omitted] ). Thus, further findings are also required on this claim.[5]
3. Retaliation. A tenant is entitled to a rebuttable presumption of retaliation if his landlord takes certain actions within six months of the tenant's engaging in protected activities. See South Boston Elderly Residences, 91 Mass. App. Ct. at 468. A landlord can rebut the presumption "only by clear and convincing evidence that [her] action was not a reprisal against the tenant and that [she] had sufficient independent justification for taking such action, and would have in fact taken such action, in the same manner and at the same time the action was taken, regardless of tenants engaging in" protected activities. G. L. c. 186, § 18, as appearing in St. 1978, c. 149, § 1. Upon a finding of retaliation, the landlord "shall be liable for damages which shall not be less than one month's rent or more than three month[s'] rent, or the actual damages sustained by the tenant, whichever is greater, and the costs of the suit, including a reasonable attorney's fee." Ibid.
Here, the judge awarded Stella three months' rent upon concluding that Lindquist retaliated against him for reporting code violations to the city. The retaliation, the judge found, took three forms: (1) raising Stella's rent, (2) serving an eviction notice, and (3) "arguabl[y] chang[ing] the terms of the tenancy with respect to the available parking." The second of these findings is not clearly erroneous. It is undisputed that Lindquist served the eviction notice within six months of Stella's reporting the violations, giving rise to a presumption of retaliation. Furthermore, the judge was justified in finding that Lindquist did not rebut the presumption. Contrary to Lindquist's assertion, the evidence showed that she knew in January of 2016, before she served the eviction notice, that Stella had reported the violations to the city. In addition, Lindquist failed to offer a sufficient independent justification for her action.[6]
The other two findings are clearly erroneous, however. Lindquist met her burden of showing that the rent increase could not have been retaliatory because Stella testified that Lindquist notified him of it in December of 2015, and there was no evidence that Lindquist even knew about Stella's call to the city until January of 2016. Regarding the purported change in parking, this finding was premised on evidence that Shepard started parking on the public street in a spot regularly used by Stella. As discussed below, however, Shepard's action cannot be imputed to Lindquist and thus does not support Stella's claim that Lindquist retaliated against him.
The evidence therefore supports a finding of only one retaliatory act -- serving an eviction notice. Because the judge predicated damages on either two or three retaliatory acts, we remand this claim for the judge to determine whether recalculation of the damages award and the corresponding award of attorney's fees is appropriate, and if so, to recalculate those amounts.
4. Discrimination. Stella brought his discrimination claim under both G. L. c. 151B and the Federal Fair Housing Act, 42 U.S.C. § 3601 et seq. (2012). The judge ruled in Stella's favor on two grounds. First, she concluded that "when [Lindquist's] agent [Shepard] began to park in a space consistently used by [Stella] due to the proximity to the building and [Stella's] limited mobility, [Lindquist] engaged in or allowed discriminatory activity to occur." Second, she concluded that "[Lindquist] and her agent engaged in discriminatory activity when they restricted [Stella's] use of the back yard due to his son's disabilities."[7]
In reaching these conclusions, the judge engaged in no independent analysis of the agency issue.[8] Instead, she adopted Stella's proposed finding that "Shepherd [sic ] ('Maintenance Manager') is the son of [Lindquist] and maintenance manager of the subject premises, and at all times relevant was operating as an agent of [Lindquist]." This finding is clearly erroneous. There was no evidence that would reasonably support characterizing Shepard as the "maintenance manager." To the contrary, the evidence was that over five years Shepard did repair work at the property on less than a handful of occasions. Indeed, in response to a question whether Shepard "ever made repairs," Stella himself testified that Shepard replaced some broken windows but, otherwise, Stella "really [hadn't] seen much."
Nor was there other evidence establishing the existence of an agency relationship between Lindquist and Shepard. "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000), citing Restatement (Second) of Agency § 1 (1958). See Cabrera v. Jakabovitz, 24 F.3d 372, 386 (2d Cir. 1994) (applying Restatement [Second] of Agency § 1 comment b definition of agency to claim under Fair Housing Act). These hallmarks are missing here. With regard to the parking issue, Lindquist has no control over where people park on a public street, nor was there evidence that Shepard parked in Stella's usual spot at Lindquist's behest. Likewise, with regard to use of the back yard, there was no evidence to support a finding that Lindquist had control over Shepard's behavior or that he was acting on her behalf.[9]
For these reasons we conclude that, as a matter of law, Shepard's acts cannot be imputed to Lindquist because he was not acting as her agent. Lindquist is thus entitled to judgment in her favor on this claim.
Conclusion. The portion of the judgment pertaining to the discrimination claim is reversed, and judgment shall enter for Lindquist on that claim. The remainder of the judgment is vacated, and the case remanded for further proceedings consistent with this memorandum and order.[10]
So ordered.
Reversed in part; vacated in part and remanded.

The monthly rent at the start of the tenancy was $500. It was increased to $550 in 2014, and again to $650 in January of 2016.

Lindquist also challenges the judge's findings that (1) the rear porch was rotting, and (2) the violations were not cured until May of 2016. We see no clear error in these findings. The first is supported by an inspection report from the department of inspectional services for the city of Worcester (city), which states that "[t]here are some rotted floor boards on the rear porch and the cement support is cracked and giving away [sic ]." The second finding is supported by evidence that the city filed a complaint in the Housing Court on May 4, 2016, seeking an injunction requiring Lindquist to bring the property into compliance with the code.

According to the same intake notes, Stella stated during the telephone call that he reported the cross-metering to his landlord and the landlord's response was "[e]viction." This evidence conflicts with Stella's testimony that, at the time of the call, he did not know of Lindquist's intent to evict him. This is but one example of the problems with Stella's testimony that the judge did not "confront ... and ... provide 'an explicit analysis of credibility and the evidence bearing on it.' " Herridge v. Board of Registration of Med., 420 Mass. 154, 164-165 (1995), quoting from Morris v. Board of Registration in Med., 405 Mass. 103, 107, cert. denied, 493 U.S. 977 (1989).

Stella suggests that, even had he consented to the cross-metering, Lindquist is still liable under G. L. c. 186, § 14, because of her failure to comply with certain provisions of the code -- for example, the requirement of a written agreement before a landlord can transfer responsibility for cross-metered utilities to a tenant. But Stella cites no case supporting the proposition that a violation of the code is alone sufficient to establish liability under G. L. c. 186, § 14. We note that in Al-Ziab v. Mourgis, 424 Mass. 847, 851-852 (1997), the Supreme Judicial Court held that "to support the imposition of liability under [G. L. c. 186, § 14 ], there must be a showing of at least negligent conduct by a landlord and violation of the lead paint statute alone is not sufficient to prove such negligence." In any event we think that this issue should be decided, if necessary, by the judge in the first instance.

We disagree with Lindquist's argument that Stella's "extreme hostility" was an independent justification. The evidence does not show, much less clearly and convincingly, that this was what motivated Lindquist to serve the eviction notice.

To the extent the judge found that Lindquist directly restricted Stella's use of the back yard, that finding is not supported by a preponderance of the evidence and is clearly erroneous.

Stella argues on appeal that Lindquist can be held liable for Shepard's discriminatory harassment, "even in the absence of an agency relationship," because Shepard is Lindquist's tenant. Stella did not raise this argument below, and we cannot consider it on appeal because it depends on facts that are not established in the record. Cf. Aetna Cas. & Sur. Co. v. Continental Cas. Co., 413 Mass. 730, 734-735 (1992). For the same reason, we cannot consider Stella's argument that the judge could have made a finding of "apparent agency."

The judge's finding was premised on evidence that Shepard told Stella's son Joseph to get out of the yard, calling him a "retard." At the same time, however, the judge credited Shepard's testimony that he did not want Joseph in the yard because of his use of profanity, including sexual profanity, around Shepard's much younger children.

Given our decision, we deny Stella's request for appellate attorney's fees.