NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-984

ADOPTION OF MILES.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a judge of the Juvenile Court found the mother unfit to parent her son, Miles, terminated her parental rights to Miles, approved the adoption plan for Miles proposed by the Department of Children and Families (department), and ordered that the mother could have four supervised posttermination and postadoption visits with Miles per year.[2]  On appeal, the mother argues that (1) the finding of unfitness was not supported by clear and convincing evidence, and (2) the judge erred in failing to properly consider the mother's proposed guardianship plan.  We affirm.

---

[1] A pseudonym.

[2] The judge also terminated the parental rights of Miles's putative father (father).  The father did not participate in the trial and is not a party to this appeal.

Background.  We summarize the judge's findings of fact, reserving certain details for later discussion.  The mother has three children, Miles, Alex, and Nina.[3]  The department's involvement with the family began before Miles's birth when, in October 2018, a report was filed pursuant to G. L. c. 119, § 51A (51A report), alleging abuse and neglect of the mother's two older children, Alex and Nina.  The 51A report alleged that Alex and Nina were present when a group of men suspected of being involved in a nearby shooting ran into the mother's apartment.  Police searched the mother's home and discovered over fifty bags of heroin and an unsecured firearm located under a pillow on the mother's bed.  The investigation led to the filing of another 51A report alleging that the mother had posted a photograph on social media of Alex, then five years old, holding a gun.[4]

The department filed a care and protection petition and was granted temporary custody of Alex and Nina; the children were removed from the mother's care and placed with the maternal grandmother (grandmother).  Alex and Nina were reunified with the mother in late January 2020, and the care and protection

---

[3] The children's names are pseudonyms.  The mother's rights to Alex and Nina were not terminated by the judge, and those children are not parties to this appeal.

[4] At trial, the mother testified that the gun in the photograph was a BB gun; the judge did not credit this testimony.

petition was dismissed.  In July 2020, the mother was found guilty of and placed on probation for Federal charges of narcotics distribution, and in March 2022, she was found guilty and placed on probation for State charges of reckless endangerment of a child and improper storage of a firearm.

Miles was born in July 2020, with no recorded injuries. For several weeks after Miles's birth, the mother, the father, and Miles's two siblings lived with the grandmother in the grandmother's home.  The family, excluding the grandmother, later moved back into the mother's apartment, where the father and the grandmother were the primary caretakers while the mother worked.  The father did not know how to hold, feed, burp, or support Miles's body and had to be taught infant-appropriate care by the mother and the grandmother, including not being rough with Miles and not holding him up only by his fingers. The three adults were Miles's only primary caretakers for the first months of his life.

On September 25, 2020, the mother brought Miles to the emergency room for a nail tear and skin abrasion to his right middle finger.  The mother reported to hospital staff that Miles had caught his finger in her necklace while he was "throwing a fit."  On October 20, 2020, the mother brought Miles, then three months old, to his pediatrician for a routine checkup.  At the appointment, the mother brought to the pediatrician's attention

3

a swollen, red mark on Miles's left clavicle, which she described as a spider bite.  Suspecting a bone fracture, the pediatrician ordered an X-ray, which revealed a healing left clavicle fracture between four and ten days old.  A mandated reporter filed a 51A report alleging neglect of Miles.

Miles was admitted to the hospital after the fracture was diagnosed, and, pursuant to the hospital's nonaccidental trauma policy, Miles received a skeletal survey, a blood panel, and a family and genetic history analysis to rule out medical explanations for the injury.  The skeletal survey revealed numerous additional bone fractures at various stages of healing: three left rib fractures between three and four weeks old; two right rib fractures consistent with multiple weeks of healing; a possible fracture of the eighth rib; a healed left humerus fracture between ten and thirty days old; a healing left femur fracture about one week old; a healed right clavicle fracture; and a healing left tibia fracture.  When questioned by medical personnel as to how Miles was injured, the mother explained that she had been bathing Miles the night before and grabbed him tightly under his arm to prevent him from slipping.[5]  As further explanation, the mother testified that she had "burped" Miles "really hard"; the judge did not credit this explanation.

_____

[5] The father did not come to the hospital after he was informed of Miles's injuries.

4

Given Miles's age, the locations of the fractures, and the absence of underlying medical issues, a pediatrician specializing in child abuse medicine formed the opinion that the injuries were intentionally inflicted and medically inconsistent with the mother's explanations.[6]  All of Miles's caretakers denied knowing how the injuries occurred or recognizing any signs of injury before the fractures were diagnosed.

As a result, the department filed another care and protection petition and obtained temporary custody of Miles, Alex, and Nina.  The mother subsequently waived her right to a temporary custody hearing, Alex and Nina were placed with the grandmother, and the department retained temporary custody of Miles.  The department then implemented a series of action plans for the mother to work toward reunification.  The plans required the mother to address concerns pertaining to her parental fitness, including:  not engaging in dating relationships that would endanger her and the children; refraining from using and distributing illegal substances; complying with the terms of her Federal probation; engaging in individual therapy; participating in parenting classes, a bonding assessment, and a psychological

---

[6] It is implicit from the judge's findings that he credited the pediatrician's opinion.

5

evaluation; and signing releases of information from her collaterals to the department.

Due to the mother's lack of engagement with action plan tasks, inconsistent communication with the department, and an absence of insight into how Miles's injuries occurred, the department changed the child's permanency goal from reunification to adoption on or about April 1, 2022.[7]  Miles, who was two years old at the close of evidence in April 2023, has lived with his foster family since he was approximately three months old and receives early intervention therapeutic services for delayed speech and muscle stiffness.

Discussion.  1.  Unfitness.  When faced with a petition to terminate parental rights, the judge must find by clear and convincing evidence that the parent is unfit, and that the unfitness is likely to continue into the indefinite future.  See Adoption of Lisette, 93 Mass. App. Ct. 284, 296 (2018).  "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age."  Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008).  The judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous.  See

---

[7] By agreement of all parties after trial, Alex and Nina were permanently placed in guardianship of the grandmother.

6

<u>Custody of Eleanor</u>, 414 Mass. 795, 799 (1993).  On review, we give "substantial deference to a judge's decision that termination of a parent's rights is in the best interest[s] of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  <u>Adoption of Yalena</u>, 100 Mass. App. Ct. 542, 549 (2021), quoting <u>Adoption of Ilona</u>, 459 Mass. 53, 59 (2011).

The mother challenges the sufficiency of the evidence supporting the judge's findings that the mother was unfit to parent Miles and likely to remain so.  She identifies six reasons underpinning the judge's ultimate findings, none of which she contends amount to the requisite clear and convincing evidence.  We are not persuaded.

a.  <u>Miles's injuries</u>.  Expert testimony established that Miles had been abused multiple times by at least one of his primary caretakers, starting as early as when he was one week old and up until his removal at three months.  While the judge noted that there was "no direct evidence [the] [m]other inflicted the injuries, she was a primary caretaker when they occurred, and she failed to prevent them."  See <u>Adoption of Larry</u>, 434 Mass. 456, 471 (2001) (unfitness may be predicated on one parent's failure to protect child from another parent's abuse); <u>Adoption of Lorna</u>, 46 Mass. App. Ct. 134, 140-141 (1999)

7

("While at least one [parent] had to have abused [the child], both [parents] were deemed unfit for their inability to protect the [child] from future abuse").

Indeed, assuming the mother had not abused Miles, she recognized concerning aspects of the father's caretaking abilities before Miles's injuries were diagnosed. She had to "repeatedly" instruct the father not to be rough with Miles and not to hold him up by just his fingers; she was aware that the father smoked marijuana daily while taking care of the children; she knew that the father would become confused and frustrated when Miles would cry; and she needed to teach the father how to hold, feed, burp, and support Miles's body appropriately. Contrast Adoption of Iris, 43 Mass. App. Ct. 95, 102-103 (1997), S.C., 427 Mass. 582 (1998) ("There was no evidence before the court that any of [the caretakers] was an inappropriate caretaker or that the parents had adverse information . . . which would have alerted them to shortcomings"). The mother also maintained a relationship with the father for months after Miles's removal, ultimately ending the relationship for reasons other than concern for Miles's safety or the safety of her other children. See Adoption of Larry, 434 Mass. at 469-470. Further, while the expert opined at trial that it was possible for an adult caretaker to miss the signs of internal injuries in a newborn, at least one of Miles's injuries (other than the left

8

clavicle fracture) was discoverable: the detective investigating the cause of Miles's injuries saw Miles at the hospital the day he was removed from the mother's care and noted that his left leg was bent and "not moving like the other limbs were." As the mother had bathed Miles the night before his injuries were diagnosed at the hospital, she had close contact with Miles and thus could have, but failed to, identify the signs of injury to his left leg.

While the mother contends that the judge erred "by failing to describe specific acts or omissions showing [the] [m]other may be at fault for [Miles's] injuries," the judge's subsidiary findings establish a nexus between Miles's injuries and the mother's shortcomings. Indeed, "[i]t was not necessary to sort out the identity of the actual abuser for each incident of abuse." Adoption of Lorna, 46 Mass. App. Ct. at 141. Where, as here, there were a discrete number of caretakers who could have abused Miles, the judge could properly find each unfit for being "unable to recognize abuse and confront it preventively." Id.

b. Compliance with action plans. The judge also properly considered the mother's lack of progress with her action plans. See Adoption of Luc, 484 Mass. 139, 147 (2020). Although the mother made some positive efforts, including consistent and appropriate participation in weekly visits with Miles, a number of key tasks remained uncompleted at the time of trial. The

mother had not participated in parenting classes, engaged in a bonding assessment, or completed a psychological evaluation -- tasks tailored to assessing and developing the mother's parenting skills, her relationship with Miles, and her insight into Miles's individual needs and the circumstances of his removal. The mother also rescinded all releases to the department in October 2021 and directed all communications outside of visitation scheduling to be coordinated between the department and her attorney. This resulted in delayed referrals to services and prevented the department from monitoring the mother's progress.

While the mother contends that many of the assigned tasks bore little relation to the parenting deficiencies identified by the department, this is belied by the record. Cf. Adoption of Leland, 65 Mass. App. Ct. 580, 585-586 (2006) (parent's lack of compliance with action plan not sufficient to support finding of unfitness where action plan tasks were unrelated to identified parental deficiencies). A bonding assessment was an appropriate task, as Miles had difficulty transitioning from his foster home to supervised visits with the mother. While the mother completed parenting classes during the first care and protection proceeding involving her two older children, parenting classes were added to her action plans here to help the mother gain insight into Miles's specific age and developmental needs and

10

the unique circumstances of his removal.  Further, given the mother's mental health diagnoses and her own history of trauma, a psychological evaluation was appropriate to assess how the department could best meet and support the mother's own needs.

c.  Relationship history.  The record also supports the judge's finding that the mother had not sufficiently addressed other parental shortcomings, including maintaining a relationship with the father after Miles's injuries were diagnosed.  While the mother testified that she "kicked" the father out of the house after she learned of Miles's injuries, the father was present at a virtual visit in April 2021, and at an in-person visit to the mother's home in October 2021.  As the mother explained to her social worker, her reasons for finally separating from the father in 2021 were not because she believed that the father was responsible for Miles's injuries, but because she felt as though "he was not contributing" and she needed to "parent him."  This demonstrated a lack of insight as to Miles's safety and the risks posed by maintaining the relationship and was relevant to the analysis of parental unfitness.  See Adoption of Paula, 420 Mass. 716, 729 (1995).  Based on our review of the record, the judge properly concluded that the mother's lack of understanding of the risks her relationship with Miles's father posed to Miles rendered her unavailable as a "safe parental resource."

11

d.  Criminal history.  The judge also considered the mother's criminal history in reaching the determination of unfitness.  In the context of Miles's history of physical abuse, the mother's 2020 convictions of drug-related offenses and 2022 convictions of reckless endangerment of a child and improper storage of a firearm, for which she was serving probation during the pendency of the proceedings, bore on the question whether the mother was able to serve as a safe parental resource and maintain a stable living environment.  See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018) ("[a] judge . . . need not wait for disaster to happen but may rely upon past patterns of parental neglect or misconduct in determining current or future fitness"); Care & Protection of Quinn, 54 Mass. App. Ct. 117, 125 (2002) (parent's criminal record is relevant to extent it bears on parental fitness).  Notwithstanding the mother's contention that her criminal history was "stale" because it preceded Miles's birth, "prior history does have prognostic value."  Adoption of Carla, 416 Mass. 510, 517 (1993).  In any event, the judge's findings of fact, taken as a whole, do not demonstrate an undue reliance on the mother's past criminal conduct in reaching the ultimate finding of unfitness, as the judge considered a "constellation of factors."  Adoption of Greta, 431 Mass. 577, 588 (2000).

12

e.  Mental health and Miles's particularized needs.  The mother is diagnosed with anxiety and depression, for which she does not take prescription medication.  While the mother reported continuous participation in individual therapy, the department was no longer able to monitor her progress in therapy or assess the content of her sessions after she rescinded releases of information in October 2021.  Contrary to the mother's contention, the judge's consideration of her mental health as a factor in his determination of her unfitness was not based solely on the number or frequency of her therapy sessions.  Indeed, rescinding releases of information pertaining to her progress and participation in therapy and failing to complete a psychological evaluation also demonstrated a lack of consistency in addressing the department's concerns regarding the effects of her mental health, if any, on her ability to parent Miles.  See Adoption of Luc, 484 Mass. at 146-147 (failure to recognize need for or to engage consistently in treatment is relevant to determination of unfitness).

As to Miles's particularized needs, at two years old, he had only spoken one word and was receiving (1) early intervention services for verbal delays and (2) physical therapy for muscle stiffness.  While the mother was aware of his developmental delays and the services he was receiving, she did not request to be involved or demonstrate an understanding of

Miles's needs. As such, the judge properly considered the mother's inconsistent participation in mental health services and her lack of understanding of Miles's needs as factors bearing on the mother's current and future fitness. See Adoption of Abigail, 23 Mass. App. Ct. 191, 193 (1986) (child's particular needs relevant to determining parental fitness as to that child).

Taken together, the judge's findings provide clear and convincing evidence of the mother's current and indefinite unfitness, and that termination of her parental rights was in Miles's best interests. See Adoption of Yalena, 100 Mass. App. Ct. at 552-553.

2. Adoption plan. After finding a parent unfit, the judge is required to assess all placement plans and "determine which placement will serve the best interests of the child." Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001). The judge's assessment of each plan must be "even handed," regardless of which party offered the plan. Adoption of Hugo, 428 Mass. 219, 226 & n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of substantial deference" (quotation and citation

14

omitted).  Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017).

The mother argues that the judge erred in failing to consider guardianship with the grandmother as an alternative to the department's proposed adoption plan.[8]  We disagree.  The judge considered the protective concerns regarding the grandmother as a placement option, as the perpetrator of Miles's injuries was still undetermined and the grandmother was one of his caretakers during the period in which he sustained the multiple, intentionally-inflicted injuries.[9]  The judge also heard testimony from the grandmother that she was unaware of Miles's speech delay and developmental needs.  To the extent the mother argues that the judge should have given greater consideration to the grandmother as a kinship placement with a shared cultural background to Miles, "[a] biological and/or

---

[8] The department contends that the mother did not adequately present the grandmother as an alternative placement plan and has therefore waived this argument.  We disagree, as the mother's trial counsel requested that, in addition to the grandmother's petition for guardianship of Miles, the grandmother be considered as an alternative to the department's proposed placement plan.  Cf. Adoption of Stuart, 39 Mass. App. Ct. 380, 393 (1995) (discussing statutory requirement that department's proposed plan "have content and substance enough to permit the court to meaningfully evaluate" it).

[9] While the grandmother was not caring for Miles in the weeks leading up to his removal, she was one of his primary caretakers during the timeframes in which he sustained injuries.

15

cultural match between child and caretaker is a desirable aim; but it is a single factor among many" in determining the child's best interests. Adoption of Irene, 54 Mass. App. Ct. 613, 622-623 (2002).[10]

In contrast, the department proposed, and the judge approved, a plan under which Miles would be adopted by his foster parents. The judge appropriately considered that Miles, who was two years old at the close of evidence, had lived with his foster parents since he was three months old and was thriving in their care, and that Miles had established a strong bond with them. Miles was also receiving early intervention therapeutic services and making progress with his development while in the foster parents' care. Considering all the facts before him, the judge contemplated both plans and acted within

---

[10] The judge also dismissed the guardianship petition filed by the grandmother; the grandmother did not appeal.

16

his discretion in determining that adoption by the foster family was in Miles's best interests.

Decrees affirmed.

By the Court (Desmond, Smyth & Tan, JJ.[11]),

_Paul Little_

Clerk

Entered:  August 21, 2025.

---

[11] The panelists are listed in order of seniority.