NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-845

ADOPTION OF YIMO (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a 2024 trial, the mother appeals from decrees issued by a Juvenile Court judge finding her unfit to parent her children, Yimo and Samuel, and terminating her parental rights pursuant to G. L. c. 119, § 26 (b), and G. L. c. 210, § 3 (c).[2] Because we conclude that the mother's unfitness at the time of trial was not established by clear and convincing evidence, we vacate the decrees and remand for further proceedings.

Background.  The Department of Children and Families (department) became involved with the mother in October 2021 after she and the father brought Samuel (then ten weeks old) to

_____

[1] Adoption of Samuel.  The children's names are pseudonyms.

[2] The father was also found unfit and his rights were terminated.  He appealed but never docketed his appeal in this court.  At the time of trial he was no longer in a relationship with the mother and lived in another State.

his pediatrician over concerns about his constant crying. The doctor noticed bruising on Samuel's abdomen and advised the family to go to an emergency room. There, believing that the bruises were consistent with potential child abuse, providers filed a G. L. c. 51A report. Yimo was evaluated but there were no signs of similar injuries. Providers then discovered that Samuel also had multiple skull fractures.

When asked about the source of Samuel's injuries, the mother reported that the abdominal bruising was likely from the father's heavy-handed attempts at burping the colicky baby. She did not, however, have any explanation for the skull fractures at that time. As the parents could not provide a satisfactory explanation for all of Samuel's injuries, both children were taken into department custody that night.

On October 12, Dr. Peter Sell examined Samuel and evaluated the injuries and examined him again nearly two weeks later. Because the type of skull fractures that Samuel experienced could result from either accidental or nonaccidental trauma, and because it is difficult to bruise a baby as young as Samuel, Dr. Sell concluded, and testified at trial, that Samuel's injuries were concerning for an inflicted injury or physical abuse, absent other circumstances to explain them. Dr. Sell did not have the opportunity to speak to the parents and, when asked

2

about any history that might explain Samuel's injuries, testified that he was not provided with any history. Dr. Sell testified that the injuries were "most consistent" with child abuse, see note 5 infra, but he did not know the cause of the fractures and bruises, and he opined that an accidental cause was possible. In the second examination, Dr. Sell found the bruises had resolved, and Samuel presented as a "very healthy" baby.

The mother's inability to explain how Samuel sustained the skull fractures remained the department's paramount concern through trial. Her action plans included a task that she "[b]e open and honest with the [d]epartment and providers around what happened with the child(ren) that led to the initial removal." The mother consistently stated that she did not know how the skull fractures occurred, and at the prompting of the department she offered numerous potential explanations of how the baby might have hit his head and been injured.

The judge found these explanations implausible and found that "without offering a reasonable explanation for how all of the injuries occurred, both [p]arents continue to pose a risk to the safety and well-being of the subject children." The judge also made findings about the mother's mental health struggles, marijuana usage, and anger management issues. The judge made

3

the following ultimate finding with respect to mother's current and future fitness:

> "Without the ability to control [her] emotions, provide a reasonable explanation as to [Samuel's] injuries, and treat [her] mental health diagnoses appropriately, the Court finds that [m]other . . . [is] currently unfit to assume parental responsibility of the subject children and that this unfitness will continue undiminished into the future."

Discussion. The department bears the burden to prove by clear and convincing evidence that the mother was, at the time of trial, unfit to parent and that the children's best interests would be served by dispensing with her consent to adoption. See Adoption of Gregory, 434 Mass. 117, 125-126 (2001). We review "to determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by clear and convincing evidence." Custody of Eleanor, 414 Mass. 795, 802 (1993). "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citations omitted). Id. at 799. Furthermore, even if none of the subsidiary findings are clearly erroneous, it does not necessarily follow that those findings prove parental unfitness by clear and convincing evidence. See id. at 799-800. The clear and convincing evidence standard means that, for the ultimate finding of unfitness, "[t]he

4

requisite proof must be strong and positive; it must be 'full, clear and decisive'" (citation omitted). <u>Adoption of Iris</u>, 43 Mass. App. Ct. 95, 105 (1997), <u>S.C.</u>, 427 Mass. 582 (1998) (<u>Iris</u>).

We conclude that this standard was not met. As the judge stated, despite "both parents engag[ing] in the majority of their action plan tasks," the "central issue before this [c]ourt remained [m]other and [f]ather's lack of explanation as to [Samuel's] injuries." As we discuss below, (1) the judge's finding that the mother was unable to explain Samuel's bruising was clearly erroneous; (2) the judge's finding that the mother's inability to explain the skull fractures showed her unfitness was error in these circumstances; and (3) the judge's remaining concerns about the mother's marijuana use, anger management issues, mental health struggles, and failure to comply fully with her action plan -- although certainly worthy of consideration -- do not rise to the level of clear and convincing evidence of the mother's unfitness.

1. <u>Bruising</u>. Regarding Samuel's bruising, the judge found, consistent with Dr. Sell's testimony, that such bruising would not be expected from "normal burping," and that, to cause the injuries, the father would have had to use an inappropriate amount of force when attempting to burp the baby. She also

5

found that the "[f]ather was overly aggressive when burping [Samuel]," that hospital staff had observed the father burping Samuel "aggressively" and told him "this burping could cause bruising," and that the father acknowledged that he probably caused the injuries, given that the location of the bruises corresponded to how he held and burped Samuel.

Despite these findings, the judge found that "neither [m]other nor [f]ather was able to provide . . . a reasonable explanation for the cause of [Samuel's] multiple bruises." This finding is clearly erroneous, where the judge found that both parents provided the same explanation -- one first raised by medical staff at the hospital -- and there was no evidence that the explanation was unreasonable or false.[3] Dr. Sell did not testify that the father's overly aggressive burping could not have caused the bruising. He was given no information about the

_____

[3] The judge found the mother's statements to be "inconsistent and contradictory" regarding when she first noticed Samuel's bruising -- on October 8, 2021, or instead on October 9, 2021. While perhaps true, this does not equate to a finding that the mother's proffered explanation of how the bruising happened was false or unreasonable. We also acknowledge the judge's comment in her conclusion of law number 17 that "[t]he burping does not explain the bruising on [Samuel's] leg." We are loath to attribute much significance to this finding, where neither Dr. Sell nor either parent was asked or testified about whether what Dr. Sell called "this small bruise . . . a centimeter or two above [Samuel's] ankle", could or could not be explained by the father's aggressive method of burping.

father's burping technique, other than having seen a reference in the medical records to "burping the baby too hard," an entry that he "didn't know what to make of."

Although the judge found the mother unfit based in part on her inability in 2021 to protect Samuel from the father's overly forceful burping, the judge did not connect this past failing to the mother's unfitness at the time of the 2024 trial.  The record does not illuminate how the mother's inability to protect a ten week old infant from his other live-in parent's attempts at soothing colic has any significant bearing on the mother's ability at the time of trial to protect that child, then three years old and no longer experiencing colic, from a noncustodial parent who at that time lived in another State.  The judge did not find that this aspect of the mother's unfitness was anything more than temporary, nor even that it was current.  See Adoption of Ilona, 459 Mass. 53, 59 (2011) (judge must decide both that parent is currently unfit and that unfitness is not merely temporary).  At best, the bruising issue could be significant to the mother's fitness only if taken together with a properly supported conclusion regarding the mother's role in the unexplained skull fractures, an issue to which we now turn.

2.  Skull fractures.  The judge credited Dr. Sell's opinion that, absent another explanation, the skull fractures were

7

concerning for abuse, and she found that none of the explanations offered by the mother sufficiently explained the injuries.[4]  However, our cases have repeatedly concluded that unexplained physical injuries, even if consistent with abuse, are insufficient to establish unfitness of a primary caretaker-parent where the injuries were not shown to be attributable to that parent's abuse or neglect.  See, e.g., Adoption of Zoltan, 71 Mass. App. Ct. 185, 188-189 (2008) (Zoltan); Adoption of Abby, 62 Mass. App. Ct. 816, 824-825 (2005) (Abby); Iris, 43 Mass. App. Ct. at 104-106.  Here, where Samuel's skull fractures were consistent with accident or abuse, it is not enough for the mother to be found unfit on the basis of her inability to identify with specificity an accidental cause.[5]  Compare Zoltan,

---

[4] With respect to one of these explanations, the judge discredited the mother's theory that Samuel might have been injured when the family's fifty-pound pit bull jumped on the mother while she was holding Samuel on the couch; the judge found that the mother "denied that [Samuel] sustained an injury from this incident."  This finding is not supported by the record.  The mother testified that she was "positive the dog hit the child" and that "[h]e was hit but I didn't think he was hit in a severity where I thought he was that injured."  Immediately before this testimony, the mother agreed that, while she originally believed Samuel was crying due to colic, he may have been crying from an unknown injury.

[5] Dr. Sell testified that Samuel's various injuries were "most consistent with child abuse in the absence of any history to explain it," but he was not asked and thus did not testify as to whether, if the bruising was explained by the father's inappropriate and overly aggressive burping technique, the skull

8

supra at 190 ("Without more, the mother's ignorance as to the cause of the injury does not reflect the 'grievous shortcomings' that must underlie a finding of parental unfitness" [citation omitted]), with Adoption of Lorna, 46 Mass. App. Ct. 134, 139 (1999) (unfitness finding supported when unchallenged medical records indicated hospital staff specifically ruled out accident).

Here, moreover, as in Iris, "there was insufficient proof that [Samuel] was in the exclusive custody of [his] mother and father during the period in which it is thought the injury happened, such that they may reasonably be seen as having caused the injury themselves." Iris, 43 Mass. App. Ct. at 102. Here the judge found that "[a]ccording to [m]other the children were always in the care of either [m]other or [f]ather." To the contrary, the mother testified that during her postpartum depressive episodes, one of her own parents or the father's mother cared for the children, and they also did so on an occasion when the mother and the father went out to dinner.[6]

_____

fractures were nevertheless still more consistent with child abuse.

[6] The mother also left the father in charge of the children, or at least Samuel, on some occasions. Indeed, the judge found that during the mother's postpartum depression, the "[f]ather assumed the majority of the caretaking responsibilities for both of the subject children." Even if it were proven that skull fractures resulted from abuse or neglect while Samuel was in the

9

That the mother chose not to affirmatively suggest that the skull fractures might have occurred while in the care of other family members -- i.e., that she chose not to try to "throw them under the bus" -- does not alleviate our concern that her inability to offer an explanation was essentially used as evidence of her own abusive or neglectful parenting.

Also as in Iris, there was no evidence "sufficient to establish that the [mother] knew who caused the injury or how or when it happened." Iris, 43 Mass. App. Ct. at 103. The mother brought Samuel to his pediatrician because he was crying and having trouble releasing gas, at which time the pediatrician noted bruises. These are hardly well-known signs of a skull fracture or other head injury. See id. ("no visible or palpable marks" on child's head; seizures began only after child arrived at hospital; no evidence of likely time span between occurrence of injury and onset of symptoms, or what discernible symptoms might be).

That the judge rejected the mother's various possible explanations for how the skull fractures could have resulted from an accident -- offered while the mother was under pressure from the department to "be open and honest" about the cause --

father's care, it would be speculative on this record to find the mother responsible.

10

does not constitute proof that the true explanation was abuse or neglect attributable to the mother. See Zoltan, 71 Mass. App. Ct. at 190 (that mother's explanation was ultimately deemed inconsistent with child's injury does not establish parental fault).

Additionally, even if there were evidence to support a finding that Samuel's skull fractures resulted from abuse or neglect (rather than an accident), and that such abuse or neglect was attributable to the mother's care, there is no such evidence in regard to Yimo. There was no sign of injury to Yimo when he was removed from the mother. Thus, even if the mother had been unfit to parent Samuel because of his being physically abused, such a finding would not automatically render her unfit to parent Yimo. See Guardianship of Estelle, 70 Mass. App. Ct. 575, 581 (2007) ("A parent may be fit to raise one child but not another").

For all of these reasons, we conclude that whatever role the mother may have played in Samuel's injuries, the evidence was insufficient to provide clear and convincing proof of her present and future unfitness as of the time of trial, as to either Samuel or Yimo.

3. Other grounds for finding of unfitness. We turn to the other factors the judge cited in finding the mother unfit: the

mother's mental health issues, substance use, and what the judge termed the mother's "history of violence and aggression." First, the mother's mental health struggles were not found to be substantially connected to her fitness. The judge found that the mother has a lengthy mental health history, including experiencing postpartum depression after Samuel's birth, and that she expressed feeling overwhelmed at the time of the children's removal. But even assuming that the mother's mental health was a barrier to her adequately parenting the children at the time of removal,[7] the judge made no finding that the mother's mental health remained unmanaged or rendered her currently unfit at the time of trial. At that time, the mother was prescribed medication to treat her depression and anxiety, and she was engaged in biweekly counseling. Without any nexus to the mother's current ability to care for the children, her mental health history has no bearing on her unfitness.

Second, nothing in the judge's findings draws a connection between the mother's admitted marijuana use and Samuel's injury

---

[7] Although we need not resolve that issue, we comment on the judge's finding that Yimo needs a caretaker who can "manage his numerous medical and educational needs related to his Down Syndrome diagnosis." The judge did not make any findings indicating that mother was ever deficient in this area. To the contrary, the judge found that, prior to removal, the mother had enrolled Yimo in early intervention services and was teaching him sign language, indicating that she was actively meeting Yimo's particular needs.

12

or any other failure to provide minimally acceptable care. Rather, the judge expressed only a general concern about the children having a sober caretaker, without making any findings that the mother's marijuana use impairs her caretaking abilities. Without evidence that the mother's marijuana use rendered her unable to provide minimally acceptable care for her children, an unfitness finding premised on substance use would be speculative. See Zoltan, 71 Mass. App. Ct. at 191; Adoption of Katharine, 42 Mass. App. Ct. 25, 32-33 (1997).

Third, the mother's anger management issues are not significantly supportive of the determination of unfitness. Here, the extent of a link found between the two was that the anger issues existed "in the context of [Samuel's] injuries." There was no finding that the mother had ever acted aggressively toward or around the children. To the contrary, at the time of trial, "the [d]epartment did not express any concerns with [the mother's] . . . ability to interact appropriately and positively with the subject children." Of the three instances of aggression that the judge noted, one predated the births of the children, the second occurred while the children were in the department's custody, and the third involved the mother's initial frustration the night her children were removed, followed by her regaining control and appropriately saying

13

goodbye to them.  Much as in Zoltan, "[w]ithout resorting to impermissible conjecture, these isolated incidents shed little light on the mother's ability to provide minimally acceptable care for her [children], and offer no basis for concluding that the [children's] welfare was put 'much at hazard' by the mother's alleged anger issues" (citation omitted).  Zoltan, 71 Mass. App. Ct. at 192.

We add that "given the absence of any clear and convincing evidence of parental unfitness, the mother's failure to comply more fully with the requirements of her service plan cannot be a significant basis for the determination of parental unfitness." Zoltan, 71 Mass. App. Ct. at 192.  Because the action plan is designed to help ameliorate parental deficiencies, where there are no clear deficiencies that the mother must rectify in order to provide minimally acceptable care, the mother's imperfect compliance with the plan has little value in finding her unfit.

We therefore reach the same conclusion and adopt the same remedy as in Zoltan, 71 Mass. App. Ct. at 196; Abby, 62 Mass. App. Ct. at 828-829; and Iris, 43 Mass. App. Ct. at 102, 106. In reaching this conclusion, we share the concern of all for an infant who presents at the hospital with unexplained bruising and fractures, but we cannot attribute those injuries to the mother's unfitness without a sound basis in the evidence.

14

"While [the children's] welfare and best interests were undoubtedly the central focus of both the judge and the department in their desire to spare [them] the risk of further injury, good intentions and genuine concern are not a satisfactory substitute for clear and convincing evidence." Iris, supra at 102. See Zoltan, supra at 187-189; Abby, supra at 828. Accordingly, as in those three cases, the decrees are vacated and the cases are remanded for further proceedings consistent with this decision. If the department's goal remains termination of the mother's parental rights, the judge shall determine whether the department has sufficient additional evidence of the mother's unfitness to warrant a new trial, and if so, the judge shall proceed promptly to trial consistent with this decision. If a new trial is not warranted or if the department's goal has changed, a plan for the reunification of the mother and her children under appropriate terms and conditions, taking into account the best interests of the children in regard to the method and timing of such transfer,

shall be devised and implemented with judicial oversight and approval.

So ordered.

By the Court (Sacks,
  Hodgens & Toone, JJ.[8]),

Clerk

Entered: April 23, 2026.

---

[8] The panelists are listed in order of seniority.